3. Karen Murphy v. Acting Commissioner Nancy Berryhill, Commissioner of Social Security Mr. Horne. Your Honor's counsel, ladies and gentlemen, I'm John Horne. I represent plaintiff appellant Karen Murphy. This is Karen Murphy's second trip here on this case. Her appeal was granted in 2014 mainly on the issue of credibility. We'll revisit that issue shortly, but the salient issue in this case deals with the medical opinions of the medical expert at the most recent hearing. It's axiomatic in this circuit that a decision maker has to consider the opinions, the evidence that favors allowance of the claim as well as the opinions that favor denial. In this case there were many opinions. It's my contention that if a witness gives one set of limitations on direct examination and another set of limitations on cross-examination, that witness has given two opinions. Now, to get down into the weeds here, the first opinion of the medical expert on direct examination was that Ms. Murphy, who had had a stroke in April 2007, still served 11.04 for 18 to 24 months. The 11.04 wound up unmentioned in the opinion, and the of December 1st, 2008, which was 20 months, a date that was never mentioned by the expert in his opinion. What I took from this record is that there were some brackets, if you will, around that date, and it was maybe not the exact midpoint, but it was a point that was an estimate between the time of one piece of medical data and the time of the later one that you could identify when she'd experienced enough medical improvement to work. I guess I want you to clarify for me whether you think this is a case with evidence that's so one sided that no Social Security judge could have come to the conclusion that this judge came to, or whether this is really more a procedural case where we just can't track the first, basically the administrative law judge's reasoning. We looked directly through the magistrate judge's opinion to the ALJ's opinion, because it does strike me that there's explanation issue, we do have a duty of deference. Both. The first, because this date was never mentioned by the expert. But primarily the second, because the evidence is all over the place, especially on cross-examination. Dr. Manders says she doesn't meet a listing as of October 31st, 2008, and then you get into later times. So again, it looked to me like it was an estimate, that December date. Well on cross-examination, the doctor said December of 2009 at one point, he even mentioned 2010. I saw a mention of 2011 at page 797. But there's no data supporting those far later dates. Oh, there were examinations that supported those later dates. Yes, there were examinations that supported, that she had reduced capacity to move her fingers quickly. Yes, those dates were on the basis of exams. As of December She got a little visit in the hospital in January 2009, but she doesn't go back until October 2009 to see her primary care doctor. Right, but as I cross-examined the witness, he went all over the place with dates from 2009, even 2010. So explain to me why that compels the for when she's, I mean obviously this is all hinging on the date last insured. She's got to show disability before December 31st, 2007, but she hasn't moved. I'm not saying she has to take the latest date. I'm saying she has to articulate for the reviewer why she picked the date she did and she didn't. With respect to credibility, it's a similar situation. The administrative law judge hasn't properly articulated why she discredited Klayment or discredited Klayment's husband. His testimony is kind of stale by then, isn't it? It's from the 2010. I know they all stipulated. I guess, does the stipulation include nothing has changed since 2010? I think that might be going too far to push that, but we may have assumed that at the hearing. The testimony of Klayment, however, was that she wasn't able to work above the sedentary level and since her birthday was in January 1958, as of January 2008, the medical vocational guidelines would have mandated allowance of the claim. So even after the period when she met or equaled a listing ended, she'd be disabled pursuant to the medical vocational guidelines. She testified she couldn't be on her feet enough to work above the sedentary level and she didn't have any skills that would transfer to that level. So as I ended up the reply brief, the most important medical opinion, well it's not exactly a medical opinion, but the most important opinion of limitations is Klayment's. Once her medically determinable impairments are conceded to be able to produce the symptoms that she's testifying to, she's just about there. The burden shifts, according to the Scott case, the burden shifts to produce, to the commissioner, to come up with some good reasons to deny the claim and discredit Klayment. And the kind of reasons that this court set forth in Murphy 1 were, well was she hang gliding? Was she running with the bulls? What is it that shows that she can work above the sedentary level? And the administrative law judge never articulated that. Okay, well if you want to save a bit for rebuttal, I can do that. Thank you. Ms. Hugo. Good morning, your honors, counsel. May it please the court, my name is Megan Hugo and I represent the Commissioner of Social Security. So where did this December 1, 2008 date come from? Well, as your honor pointed out, there was a range of dates testified to by the medical expert who's a neurosurgeon, Dr. Carl Manders. He did not specifically identify the December 1, 2008 date, but reading through the transcript, the ALJ did try to get him to pinpoint a date. And she probed him very thoroughly, she directed his attention back to medical records he had discussed earlier in his testimony. And as things went on, he refined his testimony. So he first said 12 to 18 months, which could have been as early as April 2008. He then said a year and a half. That could have gone out to April 2009, which would have gotten her passed. Correct. So he did stay up to two years. Then the ALJ directed him back to a record from October 31, 2008, which he had referenced earlier. And I believe that is his most specific testimony. He said, I can see at this particular time, October 31, 2008, she did not make a list. Which doesn't necessarily mean she wasn't disabled at that point. But it means she had improved. But if she hadn't improved enough to be able to work, it wouldn't have helped. I mean, there are zillions of Social Security cases in which somebody doesn't meet a listing, but they're nonetheless found to be disabled. Absolutely. But if the particular question is medical improvement, if she met a listing as of the date of her stroke and didn't meet a listing as of October of 2008, that would be improvement. But I'm just saying is it relevant improvement? If you've only improved from a one to a two when you have to be an eight before you can actually work, yes, there's improvement. That's great. It's wonderful for the person, but it's not legally relevant. Right. That's fair. And to that point, so he says she didn't meet a listing as of that time, October 31st, 2008, and he explained there's no deficit with respect to her musculoskeletal system. The main complaint was she had headaches. But then the main complaint with respect to the medical records was this proprioception issue, which means if she puts her hand out and you put a quarter in her hand and a dime, she can't tell the difference. Well, and she also can't feel the acceleration pedal. Proprioception is very important for being able to get around. Right. But I believe that the main complaint was hand. She also testified about the car accelerator. Right. But she could drive, although she said she didn't remember when she was able to drive. Very short distances, though. Right. But she was able to drive. But I believe that the main complaint was with respect to her hand. And the Dr. Manders testified that doesn't really have a lot of impact on most vocational activities because simply feeling really doesn't have a lot of impact on what you can do. So she could use the rapid alternating finger movements. She could go like this. She could use her fingers, her thumb, to touch the opposite fingers. Those tests varied. Sometimes they were normal. Sometimes it was slightly slower on the right. But the main problem, and he called it a very specific defect, was the feeling. And the vocational expert testified even if she couldn't feel at all, the jobs that he identified wouldn't be affected. So when you get down to really the details of Dr. Manders' testimony, he's saying, look, and he says later she can do light work. He initially says there was no limitation to what she could do exertionally because there were no defects in her musculoskeletal system. But he really focuses on this proprioception issue and says that's really the main concern. And if you look at the range, it's within one to two years that that had pretty much Yes, the ALJ's decision certainly could have been clearer. But if you look at the decision, the ALJ is focused on about 18 months. Then, as Your Honor pointed out to counsel, there are medical records around that window that really can clarify when this improvement occurred. When she had her stroke, it was almost a complete blockage of her artery. By December of 2008, December 15th, right after the medical improvement date, it had improved to 60%. Then she goes to the emergency room for a heart-related complaint and they're noting that her right-sided sensation issues were significantly improved and her speech was improved. So certainly, although there's not a sentence in the ALJ's decision that says I chose December 1st, 2008 because of these reasons, you can read enough into the decision where the ALJ is explicitly relying on Manders, talks about improvement over time, and talks about these data points within the record such that you can trace the ALJ's reasoning to this December 2008 date. So I take it this case is really just about past benefits. At this point, she would be in the advanced age category anyway? I believe she's 60 at this point. That's regarded as pretty old. With respect to the grids, that's not relevant because the light work is supported and there's really been no evidence about a sedentary RFC aside from her testimony that she couldn't be on her feet long enough at Target. She tries to work several times and it never works out. Right. And there's really not a lot of specific testimony about why. I think she said headaches was the main complaint and that's the ALJ's decision was focused a lot on headaches because that was really kind of the lingering issue that she had complained of and there was some dispute about whether that was related to the stroke, which I'm not sure that makes a difference because there's really no dispute she had headaches. But the ALJ, with respect to moving on to the subjective symptoms, the ALJ did spend a lot of time in the decision talking about the headaches, which was one of Murphy's main complaints in her testimony and her husband's testimony, and explained why the extent of limitations that they testified to just weren't supported by the record. Mr. Murphy, as you said, the parties stipulated that he would testify the same as he did in 2010. At that time, he said she was bedridden about seven times per month due to her headaches. He said earlier, around 2008, she was bedridden I think 12 times per month. Murphy testified similar that she was having headaches about five times a week. They lasted all day. And the ALJ pointed to the medical records, which showed, you know, yes, she did complain of headaches. Well, and she's in bed all day. I mean, if we were taking the husband's testimony, she's bedridden seven days a month. Right, which is very extreme. Right, that's impossible. I mean, and no vocational expert would say you could work if you were out of commission. And the ALJ just found that, you know, it wasn't supported by the medical records. And the medical records showed her own statements that her headaches were improving. They happened occasionally. They were relieved primarily by Excedrin, but she did have Fioraset. She did take gabapentin at some time. But she reported to her physicians herself that she didn't generally need to take prescriptions because they weren't generally bad enough to warrant it. I think it's perfectly reasonable. But she didn't like the side effects of the powerful medications. Well, I'm not sure that's accurate because she, there's a few references in the medical records that she didn't fill it and that she did then. She said she didn't like it. But the ALJ did specifically ask her at the hearing, did you have side effects from your medications? She said, there was one headache medicine that made me tired. I didn't like it. I got off it. And the ALJ said, well, are you on something that you like now? She said, yes, and it works. But she primarily took Excedrin. And that's borne out by the majority of the records where she's telling her doctors, the Fioraset really helps. I think there's one reference that's saying that she takes it during the day, but it keeps her up at night so she doesn't take it at night. But the bulk of the records, she's not really reporting side effects. Was Fioraset an NSAID? I'm not sure, Your Honor. I think it may have caffeine in it, which would hence the wake. So the ALJ, I think the decision that she was bedridden 7 to 12 times per month was just not borne out by Ms. Murphy's own reports. I mean, we have to be careful when ALJs look at the underlying medical records and assume that they couldn't translate into, for example, a certain level of pain. We've said we have to pay attention to subjective reports of pain. And this is a similar thing. Maybe she has underlying medical conditions, and in her case, it does require sleeping a lot. Well, she didn't report that to her doctors. If she was regularly reporting on her headaches to her doctors, both before and after the medical improvement date, I didn't see any records that she was rendered bedridden. The records overall said that controlled by medication. She testified at the hearing. She mostly took Excedrin. That helped. There was really nothing in the records that would indicate they were as severe as her and her husband had then testified to to the ALJ. Briefly, with respect to counsel's reference to the first case and the credibility finding there, the issues are totally different. In that case, the ALJ found failure to attend all of her physical therapy appointments, but didn't ask why she didn't. And in fact, there was some information in the record that showed she wanted to go somewhere closer to her house, but her insurance wouldn't approve it. So that could have been the reason. The ALJ also discredited her for taking vacations, where she really said she laid on the beach, she wasn't doing anything strenuous. The ALJ here didn't consider anything of that kind. The issue is with respect to not taking her medications. And again, the records themselves showed why she didn't take the medications, because her headaches weren't severe enough to warrant it. Okay. I see my time is up. Your time is up, so thank you very much. Thank you. Anything further, Mr. Horn? Just a word or two, Judge. As far as reporting to doctors is concerned, the jurisprudence of this court is wise in that such corroboration is not required. That's the Terry case and the Stahl case that I'm sure I cited in there. I was involved in the Stahl case. Because doctors have to focus on things. If they wrote down everything that's, let's assume that it wasn't reported to them, if they had to write down everything that was reported to them, they wouldn't do anything else. They would certainly agree with you on that point. I don't know that somebody omits, if that might be a fair inference, that it's not bothering them enough to mention it. Right. And with respect to the landmark examinations, the landmark hard evidence for picking dates when the listings ended, on, let's see, October 31, 2008, there was severely diminished proprioception in the right hand. December 21, 2009, rapidly alternating finger movements were slightly slower with the dominant right hand than with the left. And proprioception, the ability to tell where your limbs are without looking at them, was still moderately diminished in the right hand relative to the left. And then even October 15, 2010, those movements were slower. But the neurologists find that whether you're doing this quickly or slowly isn't really of vocational significance, at least for the jobs that the vocational expert identified. But if she had to watch her hand to know where it was, that would make a difference. Okay. Alright, well, thank you very much. Thanks to both counsel. We'll take the case under advisement.